## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| HANES COMPANIES, INC., d/b/a | ) | |
| HANES GEO COMPONENTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09CV918 |
| | ) | |
| GALVIN BROS., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on a Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) filed by Defendant Galvin Brothers, Inc. ("GBI"). (Docket Entry 10.) In addition, Plaintiff Hanes Companies, Inc. ("Hanes") has filed a Motion for Status Conference and Request to Begin Discovery. (Docket Entry 22.) For the reasons that follow, GBI's instant Motion to Dismiss should be denied and the case will be set for an Initial Pretrial Conference.

### I. BACKGROUND

The Complaint identifies Hanes as a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina, and GBI as a New York corporation with its principal place of business in Great Neck, New York. (Docket Entry 2, ¶ 1, 2.) Greg Hayes, GBI's Chief Estimator and one of its three equity partners (Docket Entry 10-3, ¶ 1), has averred that:

> GBI has no offices, employees, agents or representatives based in North Carolina, nor have any GBI employees,

agents or representatives traveled to North Carolina on behalf of GBI. GBI does not advertise, solicit or bid for projects located in North Carolina, nor does GBI have a telephone listing in North Carolina. GBI has no bank accounts, real estate or other property in North Carolina. GBI has never performed any work or services in North Carolina. It has never shipped any goods in North Carolina. It has never derived any revenue from North Carolina.

(Id., ¶ 16.)[1]

This case arises from a contract (valued by Hanes at approximately $2,000,000 (see Docket Entry 18, ¶¶ 21, 28-29)) under which "Hanes was to supply, and [GBI] was to purchase, components to be assembled into modular underground tanks for a construction project for which [GBI] was the general contractor." (Docket Entry 2, ¶ 3.) According to Bobby Lee Starling, Jr., Hanes's Vice President of Engineered Products (Docket Entry 19, ¶ 1), "Hanes is an authorized distributor of products made by EcoRain, Inc., including plates used for the construction of modular tanks used in underground water systems." (Id., ¶ 2.) Starling has averred that, in early 2008, he learned the Town of Babylon, New York had plans for an underground storm detention system (the "Project") and that he telephoned Babylon's engineer "to ensure that the EcoRain product would be designated as 'approved' in [the Project's] specifications." (Id., ¶ 6.) The Project's specifications (attached to Starling's affidavit) did list EcoRain's plates under the heading "Approved Product," along with two others (the "Atlantis Matrix D-Rain Tank" and "Invisible Structures, Inc.

---

[1] Hanes did not dispute these claims in its response to GBI's instant Motion to Dismiss. (See Docket Entry 20.)

Rainstore3 Underground Stormwater Retention System"), as well as any "approved Equal." (Docket Entry 19-2, § 2.01.B.)[2]

According to Hayes, "[i]n preparing to bid on the Project, GBI contacted EcoRain regarding pricing . . . and EcoRain directed GBI to contact Hanes, EcoRain's distributor . . . ." (Docket Entry 10-3, ¶ 8.) Starling's affidavit reflects that, indeed, Hayes "contacted [Starling's] office in Winston-Salem to obtain information regarding the EcoRain product . . . [and that Hanes's Technical Director Keith] Harris responded through telephone conversations from [Hanes's] office in North Carolina." (Docket Entry 19, ¶ 9.) Hayes further has averred that, "in May 2008, [he], on behalf of GBI, requested bids from all 'approved' manufacturers through their respective distributors [and] . . . requested that the bids be submitted by telephone or facsimile. In response, the distributors, including Hanes, submitted quotes to GBI." (Docket Entry 10-3, ¶ 9.) In other words, as Starling put it, "Hayes called [Starling's] office in Winston-Salem to solicit a bid from Hanes . . . [and Hanes] responded by faxing a price quote for [the] EcoRain plates from [Starling's] Winston-Salem office to [GBI] on May 21, 2008." (Docket Entry 19, ¶ 11.)

---

[2] Starling's affidavit asserts that the Rainstore3 product "is distributed by A.H. Harris and Sons, Inc. . . . [which] lists its headquarters as Newington, Connecticut, . . . [and which] has twelve offices in New York . . . ." (Docket Entry 19, ¶ 5.) In addition, it states that a "StormTank product, distributed by Vari-Tech LLC, a New York company, would be acceptable under the [P]roject['s] specifications as an 'equal' to the Rainstore3 product and the EcoRain product." (Id., ¶ 7.) GBI's subsequently-filed reply does not contest these matters. (See Docket Entry 21.)

Hayes's affidavit reflects that, "[o]n May 23, 2008, [he], on behalf of GBI, submitted GBI's bid on the Project . . . [and], at the close of the bidding that day, . . . [GBI] was awarded the contract . . . ."  (Docket Entry 10-3, ¶ 10.)

However, through the affidavits of Starling and George Swenson (GBI's manager for the Project (see Docket Entry 10-4, ¶ 2)), the parties have agreed that Hanes and GBI did not finalize their agreement until early October 2008.  (See id., ¶¶ 2-5; Docket Entry 19, ¶¶ 12-13.)  According to Hayes, "between May and October 2008, Hanes and GBI had . . . contacts regarding the possibility of GBI purchasing plates from Hanes . . . consisting of roughly a dozen phone calls, facsimiles and e-mails . . . [as well as an] in-person contact [Hayes] had with . . . Harris . . . [at GBI's] Great Neck, New York office in June 2008."  (Docket Entry 10-3, ¶ 11-12.)  Starling's affidavit reflects that, during this period, the parties had more communications than Hayes indicated,[3] in that (apart from telephone calls and facsimiles) Starling "found evidence of at least a dozen e-mails between Hanes employees in North Carolina and [GBI] employees while the contract was being negotiated[.]"  (Docket Entry 19, ¶ 27; see also id., ¶¶ 10 ("[GBI] representatives

---

[3] This difference may reflect a gap in GBI's submissions, rather than a direct conflict between the parties' evidence, in that, although Hayes purported to identify the total number of contacts "between May and October 2008 [that] Hanes and GBI had" (Docket Entry 10-3, ¶ 11), he also acknowledged that Swenson "took over discussions with Hanes in or around September 2008, along with Edward Galvin, President of GBI" (id., ¶ 15).  Moreover, other evidence from GBI acknowledges further communications prior to contract formation, but after Hayes's involvement ended.  (See, e.g., Docket Entry 10-4, ¶ 3.)

-4-

routinely contacted [Starling] in North Carolina via [his] direct line at [his] Winston-Salem office, 336 area code, or [his] cell phone, a 704 area code."), 27 ("Furthermore, there were a large number of phone calls made between [GBI] employees and [Starling] or Mr. Harris in North Carolina.").) Starling further has averred that, of those dozen or more e-mails exchanged between the parties during the negotiation period, Swenson and Hayes "sent at least seven . . . addressed to [Starling or Harris]." (Id., ¶ 12.)

As to the substance of these communications, Starling has averred that GBI "actively negotiated many aspects of the final contract" (id., ¶ 12), such that it "and Hanes' standard purchase order are significantly different . . . [due to] negotiated agreements which were integrated into the writing" (id., ¶ 16). For example, according to Starling, GBI "negotiated the terms in the final contract regarding assembly of the EcoRain plates . . . [before] decid[ing] to hire its own contractor to assemble the EcoRain plates into tanks . . . [resulting in the inclusion of] the following term in the contract: 'Hanes is not responsible for the assembly or installation.'" (Id., ¶ 17.) Starling further has sworn that GBI "requested, via e-mail sent to [him] at [his] Winston-Salem office, more detail in the contract than [he] would typically include in a standard purchase order. As a result of [GBI's] request, the contract includes a detailed spreadsheet which [he] would not include in a standard purchase order." (Id., ¶ 18.) Starling's affidavit also states that, during these negotiations, GBI "requested technical information . . . so that [Swenson] could

-5-

determine which, and how many, EcoRain plates would be required" (id., ¶ 14), as well as "information regarding Hanes' testing protocols with respect to shipments of EcoRain plates . . . [and] information regarding shipping lead times" (id., ¶ 15).[4]

In addition, the parties (via affidavits by Starling and Bill Chieco, GBI's Chief Financial Officer (see Docket Entry 10-2, ¶ 1)), have agreed that, as part of the negotiations, Hanes insisted upon and GBI executed a credit agreement. (See id., ¶¶ 3-4; Docket Entry 19, ¶ 21.)[5] Moreover, Hanes's Complaint asserts that, in this credit agreement, GBI "agreed that North Carolina law would control the relationship of the parties." (Docket Entry 2, ¶ 5.)[6] GBI has acknowledged (via sworn statements by Chieco and Swenson) that, shortly after GBI executed the credit agreement in early October 2008, Hanes began to ship EcoRain plates to GBI. (Docket

_____

[4] GBI's evidence does not materially conflict with Starling's above-quoted account. (See, e.g., Docket Entry 10-4, ¶¶ 2-5.)

[5] According to Starling, "Hanes requires a Credit Agreement in all commercial transactions because of the size of the contracts . . . and the fact that commercial relationships normally do not end upon the shipment of goods." (Docket Entry 19, ¶ 21.)

[6] Although the Complaint reports that "a copy of [the credit agreement] is attached" (Docket Entry 2, ¶ 5), the versions of the Complaint on the Docket contain no such exhibit (see Docket Entries 1-2 and 2). Hanes's brief opposing GBI's instant Motion to Dismiss also declares that the "Credit Agreement . . . states that the transactions . . . shall be governed by the laws of North Carolina." (Docket Entry 20 at 4-5 (citing Docket Entry 19, ¶ 17).) However, neither the portion of Starling's affidavit cited as support for this assertion (nor any other part thereof) mentions a choice of law provision. (See Docket Entry 19.) Nonetheless, GBI has failed to dispute Hanes's allegation in the Complaint that the parties' credit agreement provides "that North Carolina law would control the relationship of the parties" (Docket Entry 2, ¶ 5). (See Docket Entries 11 and 21.)

Entry 10-2, ¶ 4-5; Docket Entry 10-4, ¶ 5.) According to Starling, "Hanes sent [GBI] EcoRain plates almost daily, and certainly weekly, over a span of five months . . . [and] [t]he first containers [of plates] were shipped to [GBI] from Hanes' Winston-Salem distribution facility." (Docket Entry 19, ¶¶ 22-23.)[7]

Starling also has averred that "Hanes employees in North Carolina and [GBI] employees exchanged at least forty e-mails during the performance of the contract[.]" (Id., ¶ 27; see also id., ¶ 22 ("There are multiple e-mails sent from [GBI] representatives to [Starling] in Winston-Salem coordinating [the EcoRain plate] shipments.").)[8] Swenson has attributed some of those communications to the fact that he concluded "many of the

_____

[7] GBI's reply as to its instant Motion to Dismiss states that, "[t]hough Hanes contends the 'first' plates were shipped from North Carolina, GBI must assume that is a misstatement by Hanes since Hanes specifically represented to GBI that plates would be coming to New York from Tennessee." (Docket Entry 21 at 7 n.2.) As support for this position, the reply cites Paragraph 12 of Hayes's affidavit (see id.), in which he averred that, in June 2008, "Harris indicated to GBI that . . . the plates were manufactured and shipped out of Tennessee" (Docket Entry 10-3, ¶ 12). The fact that Harris may have "indicated" in June 2008 that EcoRain plates "were shipped out of Tennessee" (id.) does not require one to "assume" Hayes made a "misstatement" (Docket Entry 21 at 7 n.2) when he swore that, in October 2008, the first containers of EcoRain plates "were shipped to [GBI] from Hanes' Winston-Salem distribution facility" (Docket Entry 19, ¶ 23). Circumstances could have changed between June 2008 (before finalization of any contract) and October 2008 (when shipments began pursuant to the contract). Moreover, Swenson has averred that, "[o]riginally, Hanes' representatives advised [him] . . . that all plates would be . . . shipped from Tennessee or from some other domestic location . . . ." (Docket Entry 10-4, ¶ 7 (emphasis added).)

[8] Starling's affidavit distinguishes the 40 e-mails exchanged during the "performance" of the contract from "an additional thirty e-mails [employees of Hanes and GBI exchanged] after the dispute in New York began." (Docket Entry 19, ¶ 27.)

plates purchased from Hanes did not conform to specified measurements and/or were distorted. As a result of this, and other logistical issues with the delivery of the ordered plates, [he] was forced to contact Hanes' representatives regularly via telephone to remediate these problems, including by coordinating the return of the defective plates." (Docket Entry 10-3, ¶ 6.)

Starling's affidavit acknowledges that GBI "sent about six skids of plates it rejected to Hanes in North Carolina. Hanes accepted th[o]se plates and shipped replacement plates back to [GBI]." (Docket Entry 19, ¶ 24.) Accordingly, Starling has asserted that "Hanes fully complied with its obligations under the contract. It shipped all requested pallets and containers of EcoRain plates to [GBI]." (Id., ¶ 25; see also id., ¶¶ 19-20 (declaring that "Hanes was merely a distributor" whose only responsibility was to deliver the [EcoRain plates] to [GBI]").) Starling's affidavit further states that "Hanes sent over forty invoices to [GBI] from North Carolina between the period October 9, 2008 and January 13, 2009, which invoices were paid by [GBI] with nine separate checks [totaling $1,445,720.06] . . . directed by [GBI] either to Hanes' lockbox account at Wachovia Bank in Charlotte, North Carolina or to Hanes' office in Conover, North Carolina." (Id., ¶ 28.)[9] It declares, however, that GBI "still owes Hanes $427,195.78 plus interest . . . ." (Id., ¶ 29.)

_____

[9] According to Chieco, "Hanes sent GBI approximately seventy invoices . . . [and] GBI made all payments on th[o]se invoices by checks mailed to Hanes in North Carolina. In total, GBI issued and mailed seven checks to Hanes." (Docket Entry 10-2, ¶ 6.)

-8-

Consistent with those contentions, Hanes filed this case in North Carolina state court seeking damages for breach of contract and a declaratory judgment of non-liability for alleged defects in the EcoRain plates (Docket Entry 2), whereupon GBI removed the case to this Court on diversity grounds (Docket Entry 1). After filing its instant Motion to Dismiss (Docket Entry 10), GBI filed a complaint in New York state court against Babylon and Hanes, which asserts that "following installation . . . [Babylon's] tank system collapsed . . . and [Babylon] withheld payments under the contract [between Babylon and GBI] in an amount estimated to exceed $2.5 million." (Docket Entry 21-2, ¶ 4.) According to that complaint, GBI was not at fault, but instead "[Babylon's] design was defective. . . . The depth of the soil placed on top of the assembled tank system, as required by the contract [between Babylon and GBI], was two to three times the depth recommended by the tank system manufacturer, resulting in unsustainable vertical forces and the collapse." (Id., ¶ 5.) GBI's New York state court complaint also alleges "that [EcoRain] plates supplied by Hanes contained impurities that were inconsistent with Hanes' express warranty to [GBI] that the plates would be manufactured from 100% recycled polypropylene." (Id., ¶ 42.) As a result, it:

1) "requests a determination . . . of (i) the amount owed to Hanes, if any, based on its delivery of [EcoRain] plates . . . and whether those plates complied with [Hanes's] express warranties . . . and (ii) an award to [GBI] in an amount that [GBI] overpaid

Hanes for plates that were not in compliance with the requirements and express warranties" (id., ¶ 74); and

2) "asks the [c]ourt to determine whether the [EcoRain] plates provided by Hanes failed to comply with a relevant requirement of the Contract Documents and whether such failure caused or contributed to the collapse of the [tank system] and, upon such determination, to make a corresponding award of damages to [GBI]" (id., ¶ 77).[10]

## II. DISCUSSION

### A. LEGAL STANDARD

"When a court's personal jurisdiction is properly challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the jurisdictional question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 59-60 (4th Cir. 1993). "[If] the district court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff need prove only a prima facie case of personal jurisdiction. In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual

---

[10] Babylon's answer to GBI's New York state court complaint asserts cross-claims against Hanes that attribute any injury to GBI to negligence by Hanes and that claim a right to indemnification by Hanes, as well as counterclaims against GBI for breach of contract and breach of warranty. (Docket Entry 21-3, ¶¶ 44-63.)

-10-

disputes, in the plaintiff's favor." <u>Id.</u> at 60 (internal citation omitted); <u>see also</u> <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989) ("If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question.").

"[I]n order for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." <u>Christian Sci. Bd. of Dirs.</u> <u>of the First Church of Christ, Scientist v. Nolan</u>, 259 F.3d 209, 215 (4th Cir. 2001). "[I]t is apparent that the [North Carolina] General Assembly intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process." <u>Dillon v. Numismatic Funding Corp.</u>, 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). "Thus, the dual jurisdictional requirements collapse into a single inquiry as to whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Christian Sci. Bd.</u>, 259 F.3d at 215 (internal quotation marks omitted) (quoting <u>Int'l Shoe Co. v.</u> <u>Washington</u>, 326 U.S. 310, 316 (1945)).

A court may have personal jurisdiction over a defendant through either general or specific jurisdiction. <u>Helicopteros</u>

-11-

_Nacionales de Colombia, S.A. v. Hall_, 466 U.S. 408, 414 nn.8-9 (1984)). "[I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State. To establish general jurisdiction over the defendant, the defendant's activities in the State must have been continuous and systematic, a more demanding standard than is necessary for establishing specific jurisdiction." _ALS Scan, Inc. v. Digital Serv. Consultants, Inc._, 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted). Specific jurisdiction exists when the "suit aris[es] out of or is related to the defendant's contacts with the forum . . . ." _Helicopteros_, 466 U.S. at 414 n.8. To determine the existence of specific jurisdiction, a court considers: "(1) the extent to which the defendant 'purposefully availed' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" _ALS Scan_, 293 F.3d at 712.

As to the first of those three prongs, the United States Court of Appeals for the Fourth Circuit has identified eight "nonexclusive factors" that it and the United States Supreme Court have considered "to resolve whether a defendant has engaged in such purposeful availment . . . [i]n the business context":

> [1] whether the defendant maintains offices or agents in the forum state, _see_ _McGee v. Int'l Life Ins. Co._, 355 U.S. 220, 221 (1957);

-12-

[2] whether the defendant owns property in the forum state, see Base Metal Trading, Ltd. v. OJSC, 283 F.3d 208, 213 (4th Cir. 2002);

[3] whether the defendant reached into the forum state to solicit or initiate business, see McGee, 355 U.S. at 221; Burger King [Corp. v. Rudzewicz], 471 U.S. [462,] 475-76 [(1985)];

[4] whether the defendant deliberately engaged in significant or long-term business activities in the forum state, see Burger King, 471 U.S. at 475-76, 481;

[5] whether the parties contractually agreed that the law of the forum state would govern disputes, see Burger King, 471 U.S. at 481-82;

[6] whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship, see Hirschkop & Grad, P.C. v. Robinson, 757 F.2d 1499, 1503 (4th Cir 1985);

[7] the nature, quality and extent of the parties' communications about the business being transacted, see English & Smith [v. Metzger], 901 F.2d [36,] 39 [(4th Cir. 1990)]; and

[8] whether the performance of contractual duties was to occur within the forum, see Peanut Corp. of Am. v. Hollywood Brands, Inc., 696 F.2d 311, 314 (4th Cir. 1982).

Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (internal parallel citation omitted). "If, and only if, [a court] find[s] that the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the court] move on to a consideration of prongs two and three." Id.

The Fourth Circuit further has explained that the second prong "requires that the defendant's contacts with the forum state form the basis of the suit." Id. at 278-79. With respect to the third prong, the Fourth Circuit has approved consideration of these

-13-

"additional factors to ensure the appropriateness of the forum . . . : (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." Id. at 279.

## B. ANALYSIS

GBI's brief supporting its instant Motion to Dismiss denies the existence of both general and specific jurisdiction. (See Docket Entry 11 at 9-19.) Hanes's response argues only that specific jurisdiction exists. (Docket Entry 20 at 7-20.) Accordingly, the discussion that follows applies the record facts to the Fourth Circuit's three-prong test for specific jurisdiction, see Consulting Eng'rs, 561 F.3d at 278-79.

### i. First Prong – Purposeful Availment

GBI's brief supporting its instant Motion to Dismiss argues that "GBI did not purposely avail itself of the laws of [North Carolina]." (Docket Entry 11 at 10.) More specifically, according to GBI, "the only contacts GBI generated with North Carolina were: (1) entering into a contract with Hanes for the purchase of the [EcoRain] plates, and (2) exchanging a handful of e-mails, telephone calls and facsimiles with, and paying invoices submitted by, Hanes, all related to that single contract." (Id.) Hanes has responded that GBI "chose to avail itself to the privilege of doing business in North Carolina by purposely and consciously soliciting,

-14-

negotiating, entering, and continuing a business relationship with Hanes, in North Carolina." (Docket Entry 20 at 2.) The discussion which follows scrutinizes the parties' arguments on these points by reference to the eight factors set forth by the Fourth Circuit in Consulting Eng'rs, 561 F.3d at 278.

a. Factors One, Two, and Six – Presence, Property, Personal Visit

Purposeful availment factors one, two, and six from Consulting Eng'rs clearly weigh in GBI's favor. Specifically, the undisputed record (as documented in Section I) shows that, during the pertinent period, GBI did not maintain offices or agents in North Carolina, did not own property in North Carolina, and did not make in-person contact with a North Carolina resident in North Carolina.

b. Factor Three – Initiation of Business Relationship

In assessing purposeful availment, "the Fourth Circuit 'has given great weight to the question of who initiated the contact between the parties.'" Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 682 (M.D.N.C. 2011) (Schroeder, J.) (quoting Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV00906, 2006 WL 288422, at *5 (M.D.N.C. Feb. 6, 2006) (unpublished) (Tilley, C.J.) (citing Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 451 (4th Cir. 2000))); accord Power Beverage LLC v. Side Pocket Foods Co., C/A No. 06:12-931-TMC, 2013 WL 227875, at *5 (D.S.C. Jan. 22, 2013) (unpublished); Sloane v. Laliberte, No. 1:08CV381, 2011 WL 2938117, at *8 (M.D.N.C. July 19, 2011) (unpublished) (Auld, M.J.), recommendation adopted, slip op.

(M.D.N.C. Sept. 15, 2011) (Eagles, J.); <u>Waldron v. Atradius Collections, Inc.</u>, No. 1:10CV551, 2010 WL 2367392, at *3 (D. Md. June 9, 2010) (unpublished); <u>Fatboy USA, LLC v. Schat</u>, No. 1:07CV965, 2009 WL 3756947, at *5 (M.D.N.C. Nov. 6, 2009) (unpublished) (Dixon, M.J.), <u>recommendation adopted</u>, slip op. (M.D.N.C. Mar. 2, 2010) (Beaty, C.J.); <u>Corporate Fleet Servs. v. West Van, Inc.</u>, No. 3:08-cv-00413-FDW, 2008 WL 4949129, at *3 n.1 (W.D.N.C. Nov. 17, 2008) (unpublished).    In other words, "[p]ursuant to applicable precedent, [district courts in the Fourth Circuit] are entitled to accord special weight to the fact that it was [the defendant] that initiated contact with the [plaintiff] in [the plaintiff's home-state]." <u>CFA Inst. v. Institute of Chartered Fin. Analysts of India</u>, 551 F.3d 285, 295 n.17 (4th Cir. 2009) (citing <u>Diamond Healthcare</u>, 229 F.3d at 451).   That special weight attaches in this case because (as documented in Section I above) the undisputed record reflects that GBI initiated the business relationship at issue here by telephoning Hanes at its office in North Carolina,[11] first to request information about EcoRain plates and then to solicit a bid from Hanes as to the price it would charge to provide GBI with EcoRain plates.

GBI's reply as to its instant Motion to Dismiss contends that Hanes "initiated the business relationship . . . [because], upon learning of the Project, . . . Starling personally called [Babylon's] engineer to 'ensure' that Hanes . . . would have the

---

[11] GBI has not denied that it knew it was contacting Hanes <u>in North Carolina</u>.  (<u>See</u> Docket Entry 11 at 4-6, 14-16.)

opportunity to sell products for use at the Project." (Docket Entry 21 at 2-3.) This contention lacks merit because Starling's contact with Babylon's engineer regarding whether EcoRain plates would appear in the Project's specifications as one of a number of approved products neither constituted contact by Hanes with GBI, nor initiated a relationship between Hanes and GBI. Indeed, GBI has conceded that it had no knowledge of Hanes's contact with Babylon's engineer until after GBI contacted EcoRain to obtain information in anticipation of bidding on the Project. (See id. at 3.) GBI further asserts that EcoRain "directed GBI to contact Hanes in North Carolina . . . [and such] plaintiff-generated contact with North Carolina is precisely the same conduct this Court previously found 'mitigates against asserting jurisdiction over' an out of state defendant like GBI." (Id. (quoting Hanes Co., Inc. v. Contractor's Source, Inc., No. 1:08CV334, 2008 WL 4533989, at *11 (M.D.N.C. Oct. 6, 2008) (unpublished) (Sharp, M.J.), recommendation adopted, slip op. (M.D.N.C. Dec. 15, 2008) (Schroeder, J.)).) This argument also fails.

In the case cited by GBI, Hanes brought suit in North Carolina against a defendant-corporation with a principal place of business in Texas. Hanes, 2008 WL 4533989, at *1. The defendant-corporation "generally dealt with two . . . representatives of [a wholly-owned Hanes subsidiary], who were based in Texas." Id. at *2. The case involved non-payment claims by Hanes as to "five invoices . . . which ha[d] a combined value of $92,435.20." Id. at *9. "For three (3) of [the invoices, the defendant-corporation]

-17-

placed its orders [with Hanes's wholly-owned subsidiary] in Texas and took delivery of the products from [the] warehouse [of Hanes's wholly-owned subsidiary] in Houston, Texas." Id. at *3. "The order corresponding to the fourth [disputed] [i]nvoice was also placed in Texas, and the product was shipped from [a company with whom a Hanes-owned limited liability company had a distribution agreement] in South Carolina." Id. "Finally, the order which ultimately resulted in the issuance of the [fifth] [i]nvoice was originally generated in Houston, Texas, . . . [but] was sent to [a Hanes-owned limited liability company] in North Carolina only after Hanes' local representatives . . . instructed [the defendant-corporation] to do so due to local inventory shortages." Id.

"Hanes d[id] not explicitly argue that the facts surrounding the [five] disputed invoices [we]re sufficient to establish jurisdiction over [the defendant-corporation] when standing alone. Instead, to make its case, Hanes pull[ed] from the combined histories that [its wholly-owned subsidiary and the limited liability company it owned] had with with [the defendant-corporation] over a period that stretche[d] back almost two years . . . ." Id. at *6. Moreover, "Hanes d[id] not dispute that [the defendant-corporation] generally worked with only two representatives based out of Texas when it dealt with [Hanes's wholly-owned subsidiary]. Nor d[id] [Hanes] contest that all of the orders corresponding to the [first four disputed invoices] were placed in Texas." Id. at *9. Finally, although "Hanes ma[de] much of the fact that the [order that resulted in the fifth disputed

-18-

invoice] . . . was sent by [the defendant-corporation] to [the limited liability company owned by Hanes] in North Carolina . . ., Hanes acquiesce[d] to [the defendant-corporation's] averment that [said order] was originally placed in Texas and sent to [the limited liability company owned by Hanes] in North Carolina only upon the instruction of [Hanes's wholly-owned subsidiary's] local representatives [in Texas]." Id. at *10.

Given those facts, Magistrate Judge Sharp was "not persuaded that [the Court could] exercise personal jurisdiction over [the defendant-corporation] based solely on the [order that resulted in the fifth disputed invoice] . . . especially . . . in light of the fact that [the defendant-corporation] was purchasing only a small quantity of goods from North Carolina . . . ." Id. Magistrate Judge Sharp then focused on "how [the defendant-corporation] came to send the [order that resulted in the fifth invoice] to [the limited liability company owned by Hanes] in North Carolina in the first place." Id. at *11. In so doing, Magistrate Judge Sharp observed (consistently with the case law cited above) that "[t]he Fourth Circuit has given great weight to the question of who has initiated the contact between the parties . . . [and that] it [wa]s undisputed that [the defendant-corporation] did not seek out [the limited liability company owned by Hanes] on its own [before it placed the order that led to the fifth disputed invoice] – it was directed to [that limited liability company owned by Hanes] by [Hanes's wholly-owned subsidiary] only after [the defendant-corporation] originally tried to place its order in Texas." Id.

-19-

Magistrate Judge Sharp concluded that, "[w]hile this fact alone [wa]s not dispositive, it d[id] mitigate against asserting jurisdiction over the [defendant-corporation] . . . [because,] in Diamond Healthcare, the Fourth Circuit held that this type of unilateral activity by the plaintiff cannot create personal jurisdiction over a defendant." Id.

In the instant case, by contrast, New York-based GBI did not have a history of dealing with representatives of Hanes in New York. Nor did GBI inquire about and then solicit a bid for delivery of EcoRain plates from representatives employed by Hanes in New York, only to have those representatives direct GBI to order EcoRain plates from Hanes in North Carolina because an inventory shortage had arisen at a Hanes facility in New York. To the contrary (as detailed in Section I):

1) New York-based GBI took note that the Project's specifications identified three approved products (including one that the undisputed record shows was distributed by a company with numerous offices in New York) and permitted any approved equal (which the undisputed record indicates would have included another product sold by a New York company);

2) New York-based GBI thereafter contacted the manufacturer of EcoRain plates in California (which the record does not identify as sharing any ownership-tie with Hanes) and thereby learned that Hanes in North Carolina distributed the EcoRain plates; and

3) New York-based GBI then called Hanes in North Carolina first to request information about the EcoRain plates and then to

-20-

solicit Hanes's submission to GBI of a bid setting out the price Hanes would charge GBI to supply the EcoRain plates for GBI to use if GBI won the general contract for the Project.

Simply put, the foregoing circumstances do not establish "plaintiff-generated contact with North Carolina" (Docket Entry 21 at 3), much less "precisely the same conduct this Court previously found 'mitigates against asserting jurisdiction over' an out of state defendant" (id. (quoting Hanes, 2008 WL 4533989, at *11)).[12] Instead, the undisputed facts demonstrate that New York-based GBI chose not to restrict its search for materials it could use to fulfill any general contract it secured for the Project to available outlets in New York; rather, GBI decided to seek options outside of New York and, in so doing, learned from a third-party about Hanes, whereupon GBI took the initiative to contact Hanes in North Carolina and directly invited Hanes to enter into a substantial commercial arrangement with GBI.

These considerations cause the weighty purposeful availment factor concerning "whether the defendant reached into the forum to solicit or initiate business," Consulting Eng'rs, 561 F.3d at 278, decidedly to favor Hanes. See, e.g., Cortex Surveillance Automation, Inc. v. Security Integrators & Consultants, Inc., No. 1:05CV562, 2006 WL 994951, at *3 (M.D.N.C. Apr. 12, 2006) (unpublished) (Tilley, C.J.) ("In this case, [the Texas-based

_____

[12] They also unmistakably belie the assertion in GBI's reply as to its instant Motion to Dismiss that "all GBI did was bid on a job in its home state of New York . . . ." (Docket Entry 21 at 4.)

-21-

defendant-corporation] initiated the contact with [the plaintiff-corporation] at its North Carolina location after being referred to [it] by [the Texas-based defendant-corporation's] previous provider. The initiation of contact by [the Texas-based defendant-corporation] weighs in favor of a finding of personal jurisdiction in North Carolina."); Cree, Inc. v. Exel N. Am. Logistics, Inc., No. 1:02CV319, 2004 WL 241508, at *3 (M.D.N.C. Feb. 6, 2004) (unpublished) (Osteen, Sr., J.) ("[The California-based third-party-defendant-corporation's] purposeful availment is most clearly evidenced by its solicitation of [the North Carolina-based plaintiff-corporation's] business during the summer of 2000. [The California-based third-party-defendant-corporation] made the initial sales call to [the North Carolina-based plaintiff corporation] after learning of [its] interest from another customer."); Sheehan Pipe Line Constr. Co. v. Laney Directional Drilling Co., 228 F. Supp. 2d 1271, 1274 (N.D. Okla. 2002) ("By telephoning Plaintiff, an Oklahoma corporation, to solicit bids for the Gulf Stream Project, [the Texas-based] Defendant's conduct evidences purposeful direction of activities toward an Oklahoma resident. . . . [A] nexus exists between Defendant's forum-related contacts and Plaintiff's cause of action for non-payment for services rendered. Most significantly, Defendant solicited Plaintiff's business by contacting Plaintiff for a subcontractor bid. Defendant has sufficient minimum contacts with Oklahoma to subject it to specific personal jurisdiction in this Court." (emphasis in original)); Cardinal Indus., Inc. v. Grace Indus.,

-22-

Inc., Civ. A. 94-CV-344, 1994 WL 249770, at *1 (E.D. Pa. Jun. 1, 1994) (unpublished) (denying motion to dismiss for lack of personal jurisdiction and citing in support, inter alia, the following facts: "In early 1993, the New York Port Authority awarded [the New York-based] defendant a contract for runway paving work at La Guardia Airport. . . . [A] representative of defendant contacted [the Pennsylvania-based] plaintiff twice by phone in early 1993 in order to solicit a bid from plaintiff for [a subcontract].").

   c. Factor Four – Significant or Long-term Business Activity

   "[A]n in-state plaintiff's contract with an out-of-state defendant cannot <u>alone automatically</u> establish sufficient minimum contacts to warrant jurisdiction." <u>Pan-American Prods.</u>, 825 F. Supp. 2d at 681 (citing <u>Burger King</u>, 471 U.S. at 478) (emphasis added). However, in assessing purposeful availment, the Court must consider whether GBI engaged in "<u>significant</u> or long-term business activities in the forum state," <u>Consulting Eng'rs</u>, 561 F.3d at 278 (emphasis added). Accordingly, although the fact of a contract does not "alone automatically establish sufficient minimum contacts to warrant jurisdiction," <u>Pan-American Prods.</u>, 825 F. Supp. 2d at 681, "[t]he size of the contract is relevant in determining whether [an out-of-state defendant's] actions directed toward [the plaintiff's home-state] were sufficient to establish personal jurisdiction," <u>Cambata Aviation, Inc. v. Kansas City Aviation Ctr., Inc.</u>, No. 5:01CV00062, 2001 WL 1274426, at *3 (W.D. Va. Oct. 22, 2001) (unpublished); <u>accord</u> <u>Gateway Press, Inc. v. Leejay, Inc.</u>, 993 F. Supp. 578, 581 (W.D. Ky. 1997) (describing "size of the

-23-

contract" at issue as "highly relevant factor[]" in assessment of "whether a defendant's actions directed toward the forum were sufficiently purposeful").

As set forth in Section I, the parties' contract had a value of approximately $2,000,000 and necessitated numerous shipments over a period of months. Courts evaluating specific jurisdiction in the breach-of-contract context have concluded that "[t]he fact that the contract between [an out-of-state defendant-corporation] and [the plaintiff-corporation] involved <u>millions of dollars</u> demonstrates that [the out-of-state defendant-corporation] had a substantial connection with [the plaintiff-corporation's home-state] . . . ." <u>Cambata Aviation</u>, 2001 WL 1274426, at *3 (emphasis added); <u>accord</u> <u>English Boiler & Tube, Inc. v. Glex Inc.</u>, No. 3:12CV88DJN, 2012 WL 2131895, at *6 (E.D. Va. June 12, 2012) (unpublished) (citing, as support for finding of purposeful availment, fact that "total cost of the contract [underlying Virginia-based plaintiff's claim against out-of-state defendant] exceeded one million dollars — indicating a substantial deal"); <u>DSMC, Inc. v. Convera Corp.</u>, 273 F. Supp. 2d 14, 21 (D.D.C. 2002) ("The contract [at issue] is worth millions of dollars. [The Virginia-based defendant] has availed itself of the protections and privileges of the District [of Columbia] by entering into a substantial contract with a business located here.").

GBI nonetheless has insisted that its business connection to North Carolina fails to qualify as significant because its contract with Hanes provided for a "one-time purchase of goods" manufactured

-24-

outside North Carolina and shipped to New York.  (Docket Entry 11
at 12.)  To bolster this position, GBI's brief in support of its
instant Motion to Dismiss again relies heavily on Magistrate Judge
Sharp's opinion in Hanes, 2008 WL 4533989.  (See Docket Entry 11 at
12-14.)  Again, that reliance lacks a sound foundation.

First, GBI's brief in support of its instant Motion to Dismiss
cites "Hanes Companies, 2008 WL at [sic] *5-6," for the proposition
that "[i]t is well-established, however, that the mere purchase of
goods in North Carolina by a nonresident defendant is not enough to
support the exercise of personal jurisdiction."  (Docket Entry 11
at 12.)  Simply put, the cited pages of Magistrate Judge Sharp's
opinion do not make such a broad declaration.  See Hanes, 2008 WL
4533989, at *5-6.  Instead, in that portion of his opinion,
Magistrate Judge Sharp:  1) set out the standard for specific
jurisdiction (drawn from his longer exegesis on that subject in the
opening paragraphs of the "Discussion" section of his opinion, see
id. at *3-4); 2) outlined Hanes's arguments and authority
supporting its view that specific jurisdiction existed in North
Carolina over the Texas-based defendant-corporation based not on
the circumstances of the orders that related to the five disputed
invoices, but rather a broader course of conduct between Hanes-
owned entities and the defendant-corporation; and 3) explained, by
reference to authority from the Third, Fourth, and Seventh
Circuits, why Hanes's approach represented an improper
hybridization of the general and specific jurisdiction standards.

-25-

See id. at *5-6.  Nothing about that discussion supports, much less adopts, a general assertion of the sort ascribed to it by GBI.[13]

Second, GBI's brief in support of its instant Motion to Dismiss identifies "Hanes Companies, 2008 WL 4533989 at *10-11," as having endorsed the principle that "where, as here, the defendant buys goods from a North Carolina corporation for shipment to another state . . . [the] situation generally does not give rise to personal jurisdiction."  (Docket Entry 11 at 12.)  The cited pages of Magistrate Judge Sharp's opinion, however, contain no such sweeping conclusion.  See Hanes, 2008 WL 4533989, at *10-11.

Rather, that citation to Magistrate Judge Sharp's opinion begins in the middle of his discussion of the fact that the first four disputed invoices arose from orders placed by the Texas-based defendant-corporation with representatives of Hanes's wholly-owned

---

[13] Nor has GBI simply cited the wrong pages of the opinion, as the remainder of Magistrate Judge Sharp's analysis also fails to render any blanket judgment, as GBI suggested, that (in all or virtually all cases) "well-established" law precludes the exercise of personal jurisdiction over a non-resident, "mere purchase[r] of goods" (Docket Entry 11 at 12).  See Hanes, 2008 WL 4533989, at *7-15.  To the contrary, in that remaining portion of his opinion, Magistrate Judge Sharp concluded that specific jurisdiction was lacking under the particular facts of that case, see id. at *15, which he had found based solely plaintiff-induced contact by the defendant with North Carolina, i.e., the sending into North Carolina of only one order (out of five at issue) for a total of $4,130.94 in goods, after the Texas-based defendant first had placed that order with Hanes's representatives in Texas, see id. at *9-11; see also id. at *12-14 & nn. 15, 17 & 18, as well as "a limited number of calls and or [the] sen[ding] of an email to representatives in North Carolina to remedy allege [sic] flaws in the [goods delivered pursuant to the one order sent to North Carolina]," id. at *11 (emphasis added); see also id. at *12, and "the mere fact that one or more of the disputed invoices may have been generated in North Carolina, and payment on said invoices may have been due there," id. at *11; see also id. at *12.

subsidiary in Texas and that the fifth disputed invoice arose from an order the defendant-corporation "originally placed in Texas and sent to [a limited liability company owned by Hanes] in North Carolina only upon the instruction of [Hanes's wholly-owned subsidiary's] local representatives [in Texas]." Id. at *10. At that point, Magistrate Judge Sharp concluded that Hanes, not the defendant-corporation, induced the limited contact the defendant-corporation had with North Carolina (on which Hanes attempted to predicate its argument in opposition to the defendant-corporation's motion to dismiss); as a result, Magistrate Judge Sharp "[wa]s not persuaded that [the Court could] exercise personal jurisdiction over [the defendant-corporation] based solely on the . . . [o]rder [that led to the fifth disputed invoice]." Id. (emphasis added).

The portion of Magistrate Judge Sharp's opinion cited by GBI next takes note of the "small quantity of goods" that the Texas-based defendant-corporation purchased in the one order sent to North Carolina (at the behest of Hanes's representatives in Texas) and then discusses the Fourth Circuit's emphasis on which party initiated the relationship leading to the dispute. See id. at *10-11.[14] Given that context, in the remaining paragraphs of the pages of his opinion cited by GBI, Magistrate Judge Sharp (relying

---

[14] The fact that the case before Magistrate Judge Sharp involved only a "small quantity of goods" and business activity in North Carolina initiated solely by Hanes requires rejection of GBI's description of said case as "remarkably similar" to this one (Docket Entry 11 at 13), given that this case involves a contract for approximately $2,000,000 of goods that arose from GBI's telephone solicitation to Hanes's office in North Carolina.

particularly on Eagle Paper Int'l, Inc. v. Expolink, Ltd., No.
2:07CV160, 2008 WL 170506 (E.D. Va. Jan. 17, 2008) (unpublished))
rejected the notion that specific jurisdiction could arise from "a
limited number of calls and/or . . . an email to [Hanes's]
representatives in North Carolina to remedy allege [sic] flaws in
the products that [the defendant-corporation] had purchased [via
the one order sent to North Carolina] . . . [or] the mere fact that
one or more of the disputed invoices may have been generated in
North Carolina, and payment on said invoices may have been due
there . . . ." Id. at *11 (emphasis added). In sum, nothing in
the pages of Magistrate Judge Sharp's opinion cited by GBI (or any
other parts of that opinion's "Discussion," see id. at *3-9, 12-15)
reflects the view, espoused by GBI, that "where, as here, the
defendant buys goods from a North Carolina corporation for shipment
to another state . . . [the] situation generally does not give rise
to personal jurisdiction" (Docket Entry 11 at 12).

   Without the unwarranted legal conclusions it has drawn from
Hanes, 2008 WL 4533989,[15] GBI cannot avoid the persuasive force of

_____

   [15] Beyond Hanes, 2008 WL 4533989, the above-discussed pages of
GBI's argument (Docket Entry 11 at 12-14) cite only two cases:  1)
Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d
1055, 1059 (11th Cir. 1986), for its statement that "a mere one-
time purchaser of goods from a seller in the forum state cannot be
constitutionally subject to the exercise of personal jurisdiction"
(Docket Entry 11 at 12); and 2) Scullin Steel Co. v. Nat'l Ry.
Utilization Corp., 676 F.2d 309, 314 (8th Cir. 1982), for its
quotation of the statement in Aaron Ferer & Sons Co. v. Diversified
Metals Corp., 564 F.2d 1211, 1214 (8th Cir. 1977), that
characterized Electro-Craft Corp. v. Maxwell Elecs. Corp., 417 F.2d
365 (8th Cir. 1969), as holding that "solicitation by a nonresident
purchaser for delivery outside the forum is a more minimal contact
                                                (continued...)

the reasoning in <u>Cambata Aviation</u>, <u>English Boiler</u>, and <u>DSMC</u> that where, as here, a million-plus-dollar contract executed by an out-of-state defendant-corporation with a North Carolina resident lies at the heart of the litigation, the case for a finding of specific jurisdiction gets stronger.

---

[15](...continued)
than that of a (nonresident) seller soliciting the right to ship goods into the forum" (Docket Entry 11 at 12). In the latter of GBI's two cited cases, the Eighth Circuit explained that, in <u>Electro-Craft</u>, it had voiced the view noted by GBI because it had "applied a distinction between nonresident sellers and nonresident buyers <u>recognized in Minnesota law</u>." <u>Scullin Steel</u>, 676 F.2d at 314 (emphasis added). Moreover, to the extent <u>Borg-Warner</u> and/or <u>Scullin Steel</u> adopted (for federal due process purposes) a per se rule that a purchase of goods from outside a state (no matter what size, no matter how initiated, and no matter what other circumstances might exist) always fails to support specific jurisdiction in the seller's state, this Court should treat that rule as incompatible with the Supreme Court's rejection of "the notion that personal jurisdiction might turn on 'mechanical' tests," <u>Burger King</u>, 471 U.S. at 478. Notably, the Eleventh Circuit derived the principle promoted by GBI from precedent (including <u>Scullin Steel</u>) pre-dating <u>Burger King</u> and without citation to <u>Burger King</u>. <u>See</u> <u>Borg-Warner</u>, 786 F.2d at 1059-62. Further, both the Eighth and Eleventh Circuits more recently have sounded a less absolutist note than GBI ascribes to their prior rulings. <u>See</u> <u>Wells Dairy, Inc. v. Food Movers Int'l, Inc.</u>, 607 F.3d 515, 520 (8th Cir. 2010) (distinguishing <u>Scullin Steel</u> on grounds, inter alia, that "the plaintiff [in <u>Scullin Steel</u>] solicited [the out-of-state defendant's] business," whereas the out-of-state defendant in <u>Wells Dairy</u> "solicited the plaintiff's business, knowing that [the plaintiff] was [incorporated in the forum,] . . . and applied for credit from the [forum-based plaintiff]"); <u>Diamond Crystal Brands Inc. v. Food Movers Int'l, Inc.</u>, 593 F.3d 1249, 1268-69 (11th Cir. 2010) (recognizing that, notwithstanding <u>Borg-Warner</u>, "nonresident purchasers can still be subject to jurisdiction in the seller's forum" and citing as examples situations in which out-of-state defendant "initiat[ed] the contractual relationship" or "negotiat[ed] the contract via telefaxes or calls with the plaintiff"). In other words, as GBI stated in a portion of its reply as to its instant Motion to Dismiss addressing another purposeful availment factor, "whether jurisdiction is proper is based on the totality of the circumstances" (Docket Entry 21 at 2 n.1).

d. Factor Five – Contractual Choice of Law

The Fourth Circuit also has indicated that district courts should consider "whether the parties contractually agreed that the law of the forum state would govern disputes[.]" Consulting Eng'rs, 561 F.3d at 278. As set out in Section I, Hanes has alleged in its Complaint (and GBI has not disputed) that the credit agreement executed by the parties as an indispensable part of the instant contract provides "that North Carolina law would control the relationship of the parties" (Docket Entry 2, ¶ 5). "While not constituting submission to jurisdiction in North Carolina, [such an] agreement does manifest a purposeful availment of the laws of North Carolina in the transaction taken as a whole." Cree, 2004 WL 241508, at *3 (addressing choice-of-law provision in "non-disclosure agreement" executed by parties as part of contract negotiations) (citing Burger King, 471 U.S. at 481-82, and Diamond Healthcare, 229 F.3d at 452).

e. Factor Seven – Communications

Under Fourth Circuit precedent, "the nature, quality and extent of the parties' communications about the business being transacted" bears upon the purposeful availment inquiry. Consulting Eng'rs, 561 F.3d at 278. Evidence submitted by Hanes reflects that GBI "routinely contacted [Hanes] in North Carolina via [telephone]" (Docket Entry 19, ¶ 10) and that "there were a large number of calls made between [GBI] employees and [Hanes officials] in North Carolina" (id., ¶ 27). Additionally (as detailed in Section I), Hanes has come forward with evidence of "at

-30-

least a dozen emails between Hanes employees in North Carolina and GBI employees while the contract was being negotiated" (id., ¶ 27 (emphasis added)), with "at least seven" (id., ¶ 12) of the negotiation-phase e-mails sent by GBI to Hanes in North Carolina, as well as evidence that "Hanes employees in North Carolina and [GBI] employees exchanged at least forty e-mails during the performance of the contract" (id., ¶ 27 (emphasis added)).[16]

Further (again, as documented in Section I), Hanes has presented evidence that the parties' communications during the months-long negotiation of the contract involved highly substantive matters that, among other things, materially affected the contract terms and led to execution of a credit agreement. Moreover, even GBI's evidence establishes that the parties' communications during the life of the contract concerned not just problems with the goods delivered, but also "other logistical issues . . . ." (Docket Entry 10-3, ¶ 6.) Finally, according to evidence submitted by Hanes, in response to invoices sent to GBI by Hanes from North Carolina, GBI sent "nine separate checks [totaling $1,445,720.06] . . . either to Hanes' lockbox account at Wachovia Bank in Charlotte, North Carolina or to Hanes' office in Conover, North Carolina." (Docket Entry 19, ¶ 28.)

Given the foregoing volume and character of the parties' communications, this factor favors a finding of purposeful

---

[16] To the extent the parties' accounts regarding the quantity of their communications differ, at this stage, the Court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in [Hanes's] favor." Mylan Labs., 2 F.3d at 60.

-31-

availment.  See, e.g., Gentry Tech. of S.C., Inc. v. Baptist Health S. Fla., Inc., No. 1:11CV1232TLW, 2012 WL 847540, at *4 (D.S.C. Mar. 13, 2012) (unpublished) (citing, as support for finding of purposeful availment, fact that "contacts include[d] the correspondence between [the defendant's] attorneys in Florida and [the plaintiff's] attorneys in South Carolina during the negotiation that resulted in the parties reaching a formal, written agreement . . . [, as well as that the defendant's] representatives regularly telephoned [the plaintiff] in South Carolina during the course of their business relationship and [the defendant] sent a large volume of documents related to the agreement to [the plaintiff's] office in South Carolina"); Manley v. Air Canada, 753 F. Supp. 2d 551, 560 (E.D.N.C. 2010) ("[T]he frequent telephone calls and correspondence into North Carolina (both during negotiation of the contract and the performance thereof) and the mailing of checks to plaintiff's home address in North Carolina to pay invoices he submitted are sufficient 'minimum contacts' for specific personal jurisdiction purposes."); Message Sys., Inc. v. Integrated Broadband Servs., LLC, Civil No. CCB-09-2122, 2010 WL 2891706, at *5 (D. Md. July 20, 2010) (unpublished) ("Other contacts supporting an assertion of jurisdiction over [the defendant] include . . . [the defendant's] payment of licensing fees to Maryland[] and [the defendant's] use of Maryland phone numbers to contact [the plaintiff]."); see also Consulting Eng'rs, 561 F.3d at 279-80 (appearing to treat evidence of "approximately four telephone conversations and twenty-four emails, eight of which

-32-

were sent by [defendant]" as supporting finding of purposeful availment where "substance of these communications, according to [plaintiff], included the negotiation of [non-disclosure agreement] and discussion of a proposal for [plaintiff's] services," but concluding that all eight factors in their totality did not establish purposeful availment); Plastic Fabricating, Inc. v. Electrex Co., Inc., No. 7:12CV119, 2012 WL 1970237, at *3 (W.D. Va. May 30, 2012) (unpublished) ("[The defendant] has engaged in significant communication with [the plaintiff]. . . . [T]he facts of this case are not the same as an individual ordering something via mail or internet from a retailer in another state. Those circumstances would consist of a single brief communication.").[17]

---

[17] GBI's brief in support of its instant Motion to Dismiss argues that the parties' above-referenced communications "do[] not support the exercise of personal jurisdiction over GBI in this state." (Docket Entry 11 at 15.) As authority for that argument, it cites: 1) Hanes, 2008 WL 453989, at *11-13, for the proposition that "placing a limited number of calls and/or sending e-mails to North Carolina does not support the exercise of personal jurisdiction over [an] out of state purchaser of goods" (Docket Entry 11 at 15); and 2) three cases from the Eastern District of Virginia, Eagle Paper, 2008 WL 170506, at *5, Superfos Inv., Ltd. v. Firstmiss Fertilizer, Inc., 774 F. Supp. 393, 397-98 (E.D. Va. 1991), and Unidyne Corp. v. Aerolineas Argentinas, 590 F. Supp. 391, 396 (E.D. Va. 1984), all for the principle (quoted from Eagle Paper and attributed to Superfos and Unidyne by the reference "same") that "'it is well settled that mere telephone calls and electronic communications in furtherance of a transaction are insufficient to constitute purposeful activity'" (Docket Entry 11 at 15 (emphasis added)). The principle GBI draws from the Eastern District of Virginia cases does not require this Court to discount the communications that GBI had with Hanes for at least two reasons. First, the record (as documented in Section I) reflects that GBI directed communications into North Carolina not just during the performance of (i.e., "in furtherance of") the contract, but also in connection with matters material to the formation of the contract. This distinction has significance. See, e.g., (continued...)

## f. Factor Eight – Performance

The final factor identified by the Fourth Circuit as relevant to the purposeful availment inquiry concerns "whether the performance of contractual duties was to occur within the forum[.]" Consulting Eng'rs, 561 F.3d at 278. The Complaint alleges that, "[p]ursuant to the [c]ontract, Hanes was to supply and [GBI] was to purchase, [EcoRain plates] to be assembled into modular underground

---

[17](...continued)
Barker v. Daniel, Civil Action No. 2:10-3179-RMG-BM, 2011 WL 2581417, at *3 (D.S.C. June 2, 2011) (unpublished) (observing that "email, telephone, and mail contacts into a forum can establish personal jurisdiction under some circumstances; such circumstances normally relate to more extensive types of contact or the forming of contracts between parties" (internal citation omitted)), recommendation adopted, 2011 WL 2600598 (D.S.C. June 29, 2011) (unpublished). Second, the issue at this point is not whether the parties' communications "are sufficient" to establish purposeful availment, but instead whether such communications weigh in favor of or against a finding of purposeful availment. Given both the quantity and nature of the communications described by Hanes, although this factor may not alone compel a finding of purposeful availment, it does weigh in favor of such a finding. Nor does Magistrate Judge Sharp's discussion of the communications factor in Hanes, 2008 WL 4533989, at *11-13, dictate the discounting of the communications factor here. In the case before Magistrate Judge Sharp, the defendant-corporation only "placed a limited number of calls and/or sent an email to representatives in North Carolina to remedy allege [sic] flaws in the products that it had purchased [from a Hanes-owned entity]." Id. at *11 (emphasis added). In this case, however, Hanes (as set forth in Section I) has produced evidence that GBI placed more than a "limited number" of telephone calls and sent more than one e-mail to Hanes in North Carolina; moreover, that evidence shows that GBI's more extensive communications occurred not just during the performance of the contract, but also in connection with substantive negotiations over contract formation. Further, even evidence from GBI establishes that its communications with Hanes during the life of the contract concerned more than problems with product quality. Simply put, the foregoing distinctions regarding the scope of the communications that occurred in this case and in the case before Magistrate Judge Sharp renders Hanes, 2008 WL 4533989, at *11-13, irrelevant to the Court's consideration of the communications factor in this case.

-34-

tanks for a construction project . . . ." (Docket Entry 2, ¶ 3.) Further, the Complaint indicates (as one would expect) that the parties' contract obligated GBI to "pa[y] Hanes in full for the EcoRain [plates] [GBI] received, accepted, and installed." (Id., ¶ 8.) The Complaint, however, does not state whether the parties' contract addressed the place for performance either of Hanes's obligation to supply EcoRain plates or GBI's obligation to make payment. (See id., ¶¶ 1-19.)[18] In addition, although the lone affidavit submitted by Hanes does show that it supplied some of the EcoRain plates from its "Winston-Salem distribution facility" (Docket Entry 19, ¶ 23) and that GBI made payments to two different locations in North Carolina (id., ¶ 28), that affidavit does not assert that the contract contemplated performance of the parties' obligations of supply and payment in such a fashion (see id., ¶¶ 1-29). Finally, GBI's evidentiary submissions include a declaration that the parties' contract provided that "the [EcoRain] plates would be delivered directly to Babylon, New York" (Docket Entry 10-4, ¶ 4), but they do not otherwise discuss what, if anything, the contract specified about the place of performance of the parties' reciprocal obligations (see Docket Entries 10-2, 10-3, and 10-4).

Under these circumstances, the Court has no basis to conclude that "the performance of contractual duties was to occur within [North Carolina]," Consulting Eng'rs, 561 F.3d at 278.

---

[18] Moreover, although the Complaint asserts that the contract appears as an exhibit, the copies of the Complaint on the Docket do not contain any such attachment. (See Docket Entries 1-2, 2.)

g. Summary and Weighing of Factors

The foregoing discussion demonstrates that, of the eight factors the Fourth Circuit has recognized as relevant to a determination regarding the purposeful availment prong of the specific jurisdiction test, four (i.e., factors three, four, five, and seven) favor finding that GBI purposely availed itself of the privilege of conducting business in North Carolina and four (i.e., factors one, two, six, and eight) weigh against such a finding. More specifically, the record reflects that, in support of a finding of purposeful availment, GBI "reached into [North Carolina] to solicit or initiate business," id., GBI "deliberately engaged in significant . . . business activities in [North Carolina]," id., "the parties contractually agreed that [North Carolina] law . . . would govern disputes," id., and "the parties' communications about the business being transacted" were highly substantive in "nature [and] quality," as well as "exten[sive]," id., but, against a finding of purposeful availment, GBI did not "maintain[] offices or agents . . .[,] own[] property . . .[,] or ma[k]e in-person contact with [Hanes] in [North Carolina]," id., and no grounds exist to find that "the performance of contractual duties was to occur within [North Carolina]," id.

Given the parity in the number of factors on each side of the balance, the analysis must turn to the relative significance of the competing factors. In that regard, the Supreme Court's following admonition becomes important:

-36-

Jurisdiction in these circumstances may not be avoided merely because the defendant did not <u>physically enter</u> the forum State. Although <u>territorial presence</u> frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for <u>physical presence</u> within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of <u>physical contacts</u> can defeat personal jurisdiction there.

<u>Burger King</u>, 471 U.S. at 476 (emphasis added).

The three factors which focus on physical presence in North Carolina (and which favor GBI's position) thus cannot carry dispositive significance, where, as here, other factors show GBI "'purposefully directed'" efforts toward Hanes in North Carolina. <u>See, e.g.</u>, <u>SEI, LLC v. Take Action Media, Inc.</u>, No. 1:12CV492(JCC/TRJ), 2012 WL 4105131, at *5 (E.D. Va. Sept. 17, 2012) (unpublished) ("Factors (1), (2), and (6) do not support a finding that Defendants purposefully availed themselves of the benefits and protections of Virginia's laws because there are no allegations regarding any physical presence (via offices, agents, property, or in-person contact) in Virginia by [Defendants]. Defendants' lack of physical presence in Virginia, however, 'is not dispositive.'" (quoting <u>English & Smith</u>, 901 F.2d at 39, in turn citing <u>Burger King</u>, 471 U.S. at 476)). Moreover, as previously observed, the Court is "entitled to accord <u>special weight</u> to the fact that it was [GBI] that initiated contact with [Hanes] in [North Carolina]." <u>CFA Inst.</u>, 551 F.3d at 295 n.17 (emphasis

-37-

added).  In light of the diminished significance of the three
physical-presence-related factors favoring GBI and with the special
weight of the initiation factor added to the other factors favoring
Hanes's position (including the large size of the business deal,
the North Carolina choice-of-law clause in the parties' credit
agreement, and the significant quantity of communications between
the parties about material matters), the particular circumstances
of this case, on balance, dictate a finding that GBI "'purposefully
availed' itself of the privilege of conducting activities in [North
Carolina]," ALS Scan, 293 F.3d at 712.

### ii.  Second Prong – Nexus

The second prong of the test for specific jurisdiction
"requires that the defendant's contacts with the forum state form
the basis of the suit." Consulting Eng'rs, 561 F.3d at 278-79.
That requirement has been met because GBI's activities which
support a finding of purposeful availment concerned its contract
with Hanes and the Complaint makes clear that the performance of
that contract forms the basis of Hanes's claims.[19]

### iii.  Third Prong – Reasonableness

"[W]here a defendant who purposefully has directed his
activities at forum residents seeks to defeat jurisdiction, he must
present a compelling case that the presence of some other
considerations would render jurisdiction unreasonable." Burger
King, 471 U.S. at 477.  To assist district courts in assessing

---

[19] GBI has not contested this issue.  (See Docket Entry 11 at
7-19; Docket Entry 21 at 2-10.)

whether a defendant has made such a compelling case, the Fourth Circuit has identified these "additional factors [for a district court to consider] to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there . . . : (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." Consulting Eng'rs, 561 F.3d at 279.

As to the first of these reasonableness factors, GBI will face some burden in having to litigate in North Carolina, rather than in its home-state of New York; however, more than a half-century ago, the Supreme Court recognized that "progress in communications and transportation has made the defense of a suit in a foreign tribunal [i.e., a court in a state other than of the defendant's residence] less burdensome." Hanson v. Denckla, 357 U.S. 235, 251 (1958); see also McGee, 355 U.S. at 223 ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."). Further, GBI "has been able to secure counsel to represent its interests, and its litigation burden is thus no more substantial than that encountered by other entities that choose to transact business in [North Carolina]. More simply, [GBI] is not shielded

-39-

from civil liability in [North Carolina] because it is headquartered in [New York]." CFA Inst., 551 F.3d at 296.

Accordingly, "while the Court's exercise of jurisdiction will geographically inconvenience and thereby burden [GBI] somewhat, the distance and travel logistics are not great and are the mirror image of the burden on [Hanes] of the converse, a consideration reflected in the third [reasonableness] factor: [Hanes's] interest in obtaining convenient, effective relief in this forum, where [Hanes] is located and elected to litigate." Panterra Eng'red Plastics, Inc. v. Transportation Sys. Solutions, LLC, 455 F. Supp. 2d 104, 111 (D. Conn. 2006) (emphasis added) (addressing burden of traveling between North Carolina and Connecticut); see also Tubular Textile Mach. & Compax Corp. v. Formosa Dyeing & Finishing, Inc., No. 4:96CV00391, 1997 WL 33150812, at *5 (M.D.N.C. Jan. 29, 1997) (unpublished) (Beaty, J.) ("Plaintiffs have a substantial interest in obtaining relief in North Carolina the state in which they are based, and would suffer similar hardship [to that faced by defendant] if [they are] forced to litigate in [defendant's home-state].").  The second reasonableness factor also supports the exercise of personal jurisdiction in this case because "North Carolina has a manifest interest in providing an effective means of redress for its resident corporations who are not compensated for their services." Tubular Textile, 1997 WL 33150812, at *5; accord CFA Inst., 551 F.3d at 296 ("Virginia has a valid interest in the resolution of the grievances of its citizens and businesses,

-40-

particularly when they potentially involve issues of Virginia law.").

In its briefing addressing the reasonableness prong of the specific jurisdiction analysis, GBI has offered no argument concerning "the interests of the [parties' home-]states in furthering substantive social policies," Consulting Eng'rs, 561 F.3d at 279. (See Docket Entry 11 at 16-19; Docket Entry 21 at 8-10.) Accordingly, the only remaining reasonableness factor concerns "the shared interest of the [parties' home-]states in obtaining efficient resolution of disputes," Consulting Eng'rs, 561 F.3d at 279. On this point, GBI asserts that the New York state court litigation it launched after Hanes commenced this action will provide a more efficient forum for resolution of Hanes's instant claims. (Docket Entry 11 at 18-19; Docket Entry 21 at 9-10.) Hanes, however, has offered a plausible theory as to why the claims it has raised in this case do not require resolution in the same forum with the broader case in New York state court. (See Docket Entry 20 at 20 ("Hanes delivered the [EcoRain plates] to [GBI] in accordance with the express terms of the contract. Thus, under North Carolina law – which governs the relationship between [GBI] and Hanes – [GBI] has no defense to the present action."); see also Docket Entry 2 at ¶¶ 7, 8, 13-18 (setting forth factual allegations showing that GBI accepted delivery of EcoRain plates from Hanes, but did not pay for all such deliveries and explaining, with detailed references both to the parties' contract and North Carolina law, why Hanes, as a distributor who disclaimed any

-41-

warranties, could have no liability to GBI for any alleged defects in the EcoRain plates Hanes delivered).)

Under these circumstances, GBI has not made a "compelling case . . . [that] would render jurisdiction unreasonable," Burger King, 471 U.S. at 477. "[R]easonableness analysis is designed to ensure that jurisdictional rules are not exploited in such a way as to make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." Christian Sci. Bd., 259 F.3d at 217 (internal quotation marks omitted). GBI has not shown that litigation in North Carolina would expose it to any such fundamental unfairness.

### III. CONCLUSION

Hanes has made a prima facie showing that specific jurisdiction exists in this Court as to GBI. First, the record before the Court reflects that GBI purposefully availed itself of the privilege of conducting business in North Carolina in that GBI solicited a North Carolina-based corporation to enter into a significant commercial relationship (which included a credit agreement providing that North Carolina law would govern the parties' dealings) and GBI directed into North Carolina a substantial volume of communications of a substantive nature regarding the formation and fulfillment of that commercial relationship, as well as numerous payments on large invoices submitted from North Carolina. Second, Hanes's claims for breach-of-contract and declaratory judgment arise from GBI's foregoing contacts with North Carolina. Third, no other basis exists to find

-42-

that litigation in North Carolina would make this Court's exercise of personal jurisdiction over GBI unreasonable as a matter of law.

**IT IS THEREFORE RECOMMENDED** that GBI's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) (Docket Entry 10) be denied.

**IT IS ORDERED** that the Clerk shall set this case for an Initial Pretrial Conference before the undersigned Magistrate Judge on April 29, 2013.

**IT IS FURTHER ORDERED** that Hanes's Motion for Status Conference and Request to Begin Discovery (Docket Entry 22) is **DENIED AS MOOT**.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 15, 2013